**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| Nex-X Silicon LLC,<br><br>Plaintiff,<br>v.<br><br>Advanced Micro Devices, Inc.,<br><br>Defendant. | Civil Action No. 7:26-cv-411<br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Nex-X Silicon, LLC ("Plaintiff" or "Nex-X") in its Complaint for Patent Infringement against Defendant Advanced Micro Devices, Inc., ("AMD" or "Defendant"), hereby alleges as follows:

## NATURE OF THE ACTION

This is a civil action for the infringement of United States Patent No. 8,624,627 (the "'627 Patent"), United States Patent No. 8,856,587 (the "'587 Patent"), United States Patent No. 8,966,232 (the "'232 Patent"), and United States Patent No. 9,229,884 (the "'884 Patent") (collectively, the "Asserted Patents") under the Patent Laws of the United States, 35 U.S.C. § 1 *et. seq*.

## THE PARTIES

1. Nex-X is a Texas limited liability company with its principal place of business at 3571 Far West Blvd., Austin, TX 78731.

2. AMD is a Delaware corporation with its principal place of business at 2485 Augustine Drive, Santa Clara, California 95054.

3. AMD makes, sells, offers to sell, uses, and/or provides products and services throughout the United States, including in this District, and introduces products and services incorporating the accused technology into the stream of commerce knowing they will be sold and used in this District and elsewhere in the United States. For example, and without limitation, AMD conducts business in this District at least through its five regular and established places of business in the Western District of Texas, including at 12301 Research Blvd., Suite 300, Austin, TX 78759; 1340 Airport Commerce Drive, Austin, TX 78741; 7000 West William Cannon Drive, Austin, TX 78735; 7171 Southwest Parkway, Austin, TX 78735; and 8000 Metropolis Drive, Building C, Austin, TX 78744. *See* AMD, Corporate Locations, Global Directory of AMD Corporate Locations, available at https://www.amd.com/en/corporate/locations.html. AMD has been registered to do business in the State of Texas since August 1, 1975, and may be served with process via its registered agent: CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201. *See* Comptroller.Texas.Gov, available at https://comptroller.texas.gov/taxes/franchise/account-status/search/19416923001.

**JURISDICTION AND VENUE**

4. This civil action arises under the Patent Laws of the United States, 35 U.S.C § 1 *et seq.*, including without limitation 35 U.S.C. §§ 271, 281, 283, 284, and 285. Accordingly, this Court has subject matter jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331 and 1338(a).

5. This Court has specific and general personal jurisdiction over AMD at least because AMD has committed acts in this District giving rise to this action, and because AMD is present in and transacts and conducts substantial business activity in this District, including at

12301 Research Blvd., Suite 300, Austin, TX 78759; 1340 Airport Commerce Drive, Austin, TX 78741; 7000 West William Cannon Drive, Austin, TX 78735; 7171 Southwest Parkway, Austin, TX 78735; and 8000 Metropolis Drive, Building C, Austin, TX 78744. *See* AMD, Corporate Locations, Global Directory of AMD Corporate Locations, available at https://www.amd.com/en/corporate/locations.html.



**Global Directory of AMD Corporate Locations**

Visit the Support page for general support or contacting - AMD sales, partners, and other departments.

**Americas** Europe, Middle East and Africa Asia Pacific

| | | | |
|---|---|---|---|
| El Salvador, 5220, Palermo Soho<br>Buenos Aires<br>**Argentina**<br>Tel: +54 11-4877-6442 | 230, George Ohm Street<br>Sao Paulo - SP 04576-020<br>**Brazil**<br>Tel: +55 11-3478-2150 | 2500-500 4th Avenue SW<br>Calgary, AB T2P 2V6<br>**Canada** | 1 Commerce Valley Drive<br>Markham, ON L3T 7X6<br>**Canada** |
| 33 Commerce Valley Drive<br>Markham, ON L3T 7N6<br>**Canada** | 160 McNabb Street<br>Markham, ON L3R 4B8<br>**Canada** | 84 Hines Road, Suite #300<br>Ottawa, ON K2K 3G3<br>**Canada** | 2930 Virtual Way #300<br>Vancouver, BC V5M 4X6<br>**Canada** |
| 420 Weber Street, North Suite #J<br>Waterloo, ON N2L 4E7<br>**Canada** | Blvd. Manuel Avila Camacho No. 40<br>Lomas de Chapultepec<br>11000 Mexico City<br>**Mexico**<br>Tel: +55 11-3478-2150 | 15455 N Dallas Parkway, Suite #1230<br>Addison, TX 75001<br>**United States** | 5051 Journal Center Blvd., NE, Suite #310<br>Albuquerque, NM 87109<br>**United States** |
| 12301 Research Blvd., Suite 300<br>Austin, TX 78759<br>**United States** | 1340 Airport Commerce Drive<br>Austin, TX 78741<br>**United States** | 7000 West William Cannon Drive<br>Austin, TX 78735<br>**United States** | 7171 Southwest Parkway<br>Austin, TX 78735<br>**United States**<br>Tel: +1 512-602-1000 |
| 8000 Metropolis Drive, Building C<br>Austin, TX 78744<br>**United States** | 2002-156th Avenue NE<br>Bellevue, WA 98007<br>**United States**<br>Tel: +1 425-586-6401 | 90 Central Street<br>Boxborough, MA 01719<br>**United States**<br>Tel: +1 978-795-2500 | 300 Westage Business Center Drive, Suite 200<br>Fishkill, NY 12524<br>**United States** |

6. AMD's five Austin, Texas offices account for approximately 2,981 of its 21,445 employees, making it the largest AMD location worldwide. *See* unify, Company Insights, *How Many People Work at AMD? Headcount and Employee Trends*, available at https://www.unifygtm.com/insights-headcount/amd.

# AMD Employees by Location




AMD's talent is distributed across more than twenty global sites. Austin, Texas is the largest named hub with 2,981 employees, followed by significant engineering centers in Bengaluru (1,312) and Hyderabad (1,217). North American R&D remains strong with 781 employees in San Jose, 497 in the broader San Francisco Bay Area, 359 in Santa Clara, and 354 in Markham, Canada, while Toronto contributes 887 employees and Singapore hosts 617. The catch-all "Other" category accounts for 12,440 employees, indicating a wide footprint that spans multiple additional countries and regional offices.

| | | | | | |
|---|---|---|---|---|---|
| Austin, TX | Bengaluru, India | Hyderabad, India | San Jose, CA | Toronto, Canada | Singapore, Singapore |
| 2,981 | 1,312 | 1,217 | 781 | 887 | 617 |
| San Francisco Bay Area, CA | Markham, Canada | Santa Clara, CA | Other | | |
| 497 | 354 | 359 | 12,440 | | |

7. This Court has specific personal jurisdiction over AMD because Nex-X's causes of action arise, at least in part, from AMD's contacts with and activities in this District. AMD has infringed the Asserted Patents within this District by making, using, testing, selling, offering for sale, and/or importing in or into this District products that infringe Nex-X's Asserted Patents, including but not limited to the Accused Products. AMD makes, uses, tests, sells, offers for sale,

imports, distributes, advertises, promotes, and/or commercializes such infringing products and services, including but not limited to the Accused Products, in this District.

8. Because AMD has committed acts in this District giving rise to this action, and because it has established continuous and systematic operations in this District, exercise of personal jurisdiction over AMD would not offend traditional notions of fair play and substantial justice.

9. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400(b) because AMD has committed and continues to commit acts of infringement within this District giving rise to this action and maintains multiple regular and established places of business in this District, including but not limited to AMD's five regular and established places of business iat 12301 Research Blvd., Suite 300, Austin, TX 78759; 1340 Airport Commerce Drive, Austin, TX 78741; 7000 West William Cannon Drive, Austin, TX 78735; 7171 Southwest Parkway, Austin, TX 78735; and 8000 Metropolis Drive, Building C, Austin, TX 78744. *See* AMD, Corporate Locations, Global Directory of AMD Corporate Locations, available at https://www.amd.com/en/corporate/locations.html. These locations provide critical functionality for AMD's operations, including a research and development campus, state-of-the-art wafer fabrication facility, AMD's Customer Engagement Center, testing labs, and development of leading-edge semiconductor technology. *See* Gottfried Alexander Law Firm, AMD, available at https://galfaustin.com/amd/; McCaul.house.gov, Home, Media Center, Press Releases, *McCaul Tours Advanced Micro Devices Campus in Austin*, available at https://mccaul.house.gov/media-center/press-releases/mccaul-tours-advanced-micro-devices-campus-austin; *see also* Vital Atman, John Smith, *Discover the Secrets of AMD's US Office Locations: A Comprehensive Guide*, July 30, 2026, available at https://omegas.vitalatman.com.br/discover-the-secrets-of-

amds-us-office-locations-a-comprehensive-guide (identifying AMD's Austin, Texas facilities as "focus[ing] on product development, sales, and engineering"). AMD has committed acts of infringement in this District by at least making, using, testing, offering for sale, and/or selling the Accused Products and services in this District, as described in more detail herein.

## FACTUAL BACKGROUND

## BACKGROUND OF THE TECHNOLOGY

10. The Asserted Patents are directed to advanced integrated circuit (IC) and microprocessor architecture innovations designed to optimize power efficiency, execution performance, memory reliability, and hardware virtualization security. Each of the inventions of the Asserted Patents were conceived by employees of Freescale Semiconductor Inc. ("Freescale"), an Austin, Texas-based global leader in designing and manufacturing embedded processing semiconductors. Freescale, which was created by the divestiture of the Semiconductor Products Sector of Motorola, has been a pioneer in microcontrollers, processors, and sensors for automotive, networking, and industrial applications. It merged with NXP Semiconductors in 2015.

11. The integrated circuits and microprocessor architectures detailed across the Asserted Patents represent a multi-faceted approach to optimizing performance, power consumption, reliability, and security in complex computing systems. Modern semiconductor designs face constant trade-offs between the operational demands of processing speed, energy efficiency, fault isolation, and hardware-level virtualization. The innovations taught and claimed by the Asserted Patents introduce structural and algorithmic techniques that allow silicon devices to dynamically adapt to varying operational demands, whether that involves idling main central processing unit (CPU) core processing, reallocating memory structures when switching between

multithreaded and single-threaded modes, recovering from soft and hard memory errors in cache, or enforcing strict partition boundaries between virtualized computer systems.

12. A primary focus of the Asserted Patents is efficient power domain management. In conventional microprocessors, performing power domain state changes required an active central processing unit (CPU)—the core computing engine of a system—executing power domain software routines, which inherently consumes higher power and introduces latency when the microprocessor was engaged in low-power transitions. The presented technology overcomes these limitations by decoupling the hardware that performs such critical power management functions from the core computing engine, and moving the power management hardware into a power domain different from the one used by the CPU core. In this way, the system can autonomously sequence power state changes across distinct logic blocks on the microprocessor, while its CPU core remains completely suspended, drastically lowering the energy consumption of standby/low power footprints without compromising wake-up times or the operating independence of a CPU cores.

13. In parallel with power management optimizations, the technology of the Asserted Patents advance memory architecture and dynamic resource allocation by increasing the resilience of a cache system that experiences memory errors. The technology of the Asserted Patent portfolio incorporates a cache lockout policy scheme that, in response to errors arising in cache lines, applies one of a plurality of different possible cache lockout policies depending on any of a number of criteria that are detectable by the system at runtime. This helps maintain cache stability, and therefore system stability, without triggering unneeded global interrupts every time a cache error occurs.

14. The technology of the Asserted Patents also increases efficiency in multi-threaded systems by introducing a device and method that can allow hardware resources to be allocated across threads when a system is in a multi-threaded mode, while allowing those same resources to be seamlessly pooled together for use by a single thread so as to boost throughput when the system is in single-threaded mode.

15. The technologies of the Asserted Patents also enable more efficiently implemented hardware-enforced virtualization and multi-partition security in computer systems. As embedded and general-purpose devices increasingly host multiple independent execution environments often serving different users that each require its own partition of the system's resources, isolating these partitions at the hardware level becomes vital. The Asserted Patents teach and claim mechanisms for accessing resources that are shared across different partitions, such as interrupt controllers, without compromising security requirements by for example, allowing unauthorized cross-partition access of those resources.

## **THE ASSERTED PATENTS**

16. U.S. Patent No. 8,624,627 ("'627 Patent"), titled "METHOD AND DEVICE FOR LOW POWER CONTROL," issued on January 7, 2014. The '627 Patent names inventors Anis M. Jarrar, William C. Moyer, and Jim C. Nash. The application leading to the '627 Patent was filed on June 29, 2012. **Exhibit 1** contains a true and correct copy of the '627 Patent.

17. U.S. Patent No. 8,856,587 ("'587 Patent"), titled "CONTROL OF INTERRUPT GENERATION FOR CACHE," issued on October 7, 2014. The '587 Patent names inventor William C. Moyer. The application leading to the '587 Patent was filed on May 31, 2011. **Exhibit 2** contains a true and correct copy of the '587 Patent.

18. U.S. Patent No. 8,966,232 ("'232 Patent"), titled "DATA PROCESSING SYSTEM OPERABLE IN SINGLE AND MULTI-THREAD MODES AND HAVING MULTIPLE CACHES AND METHOD OF OPERATION," issued on February 24, 2015. The '232 Patent names inventor Thang M. Tran. The application leading to the '232 Patent was filed on February 10, 2012. **Exhibit 3** contains a true and correct copy of the '232 Patent.

19. U.S. Patent No. 9,229,884 ("'884 Patent"), titled "VIRTUALIZED INSTRUCTION EXTENSIONS FOR SYSTEM PARTITIONING," issued on January 5, 2016. The '884 Patent names inventors Bryan D. Marietta, Gary L. Whisenhunt, Kumar K. Gala, and David B. Kramer. The application leading to the '884 Patent was filed on April 30, 2012. **Exhibit 4** contains a true and correct copy of the '884 Patent.

20. Each of the inventions of the Asserted Patents were conceived by employees while at Freescale.

21. Each of the Asserted Patents is presumed valid and enforceable under 35 U.S.C. § 282.

22. Nex-X is the owner and assignee of all right, title, and interest in the Asserted Patents, including the right to grant licenses, to exclude others, and to recover damages for infringement of those patents.

## COUNT I

## (INFRINGEMENT OF U.S. PATENT NO. 8,624,627)

23. The preceding paragraphs are incorporated by reference as if fully set forth herein.

24. The '627 Patent recites 20 claims including independent claims 1, 16, and 20. *See* **Ex. 1**, 17:45-20:29.

25. Defendant has infringed and continues to infringe, literally or by the doctrine of equivalents, at least claim 1 of the ’627 Patent by making, using, testing, selling, offering for sale, or importing into the U.S. products and services covered by the ’627 Patent.

26. The claims of the ’627 Patent are directed to patent-eligible subject matter. In particular, the ’627 Patent is directed to, *inter alia*, a specific improvement in the computer operation of electronic devices having various power modes of operation. The inventions claimed in the ’627 Patent provide a specific technical solution to a previously unsolved technical problem. In a conventional integrated circuit (IC), a centralized power controller implemented by the CPU core of the IC is used to transition an IC through its various power modes. That is, the CPU core would need to execute power management software for any part of the IC to be transitioned through its various power modes. This means that once the CPU core has been placed into a low/standby power mode in which it cannot execute software, there is no way to transition any part of the integrated circuit back into a higher power mode without first waking up the CPU core and then running the power management software on the CPU core. This in turn means suffering through a CPU core long wakeup time and consuming more power (i.e., to place the CPU core in a high-power mode even though it was in a low power mode).

27. To address this issue, the inventors of the ’627 Patent developed a device and method by which the power controller is decoupled from the CPU core and moved to an input/output (I/O) region of the IC that is powered by a power supply for the I/O region as opposed to a power supply for the CPU core. By implementing the power controller in this way, various parts of the IC can be transitioned between high and low power modes without the involvement of the CPU core. As such, it is not necessary to wake up the CPU core and run it in a high-power mode, in order to transition other parts of the integrated circuit between power

modes. Therefore, the overall performance and power consumption profile of the system is improved.

28. The Defendant has directly infringed and continues to directly infringe at least claim 1 of the ’627 Patent, either literally and/or under the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States systems covered by one or more claims of the ’627 Patent. Defendant’s products and/or services that infringe the’627 Patent include, but are not limited to, AMD’s Ryzen 5 5000 Series products incorporating Zen 3 Cores, as well as any other AMD products, either alone or in combination, that operate in substantially the same manner (the “Accused ’627 Products”).

29. Claim 1 of the ’627 Patent is reproduced below:

> *1. A device comprising:*
>
> *a logic core of an integrated circuit (IC) die comprising a plurality of logic modules including a first logic module, the first logic module to operate in one of a plurality of indicated power states including a first power state and a second power state;*
>
> *a periphery region of the IC die defined by a plurality of I/O pads abutting an edge of the IC die, wherein the plurality of I/O pads of the IC die are to provide a signal interface between the plurality of logic modules and external the IC die; and*
>
> *a power control module, residing within the periphery region, to control transition the first logic module between the plurality of power states, including from the first power state to the second power state.*

**Ex. 1** at 17:45-60.

30. A claim chart showing an example of how Defendant infringes the ’627 Patent accompanies this Complaint as **Exhibit 5**.

31. Defendant directly infringed and continues to directly infringe one or more claims of the ’627 Patent, including at least claim 1 of the ’627 Patent, in the state of Texas, in this judicial district, and elsewhere in the United States by, among other things, making, using, selling, offering for sale, and/or importing into the United States products that embody one or more of the inventions claimed in the ’627 Patent, including but not limited to the above-identified AMD’s Ryzen 5 5000 Series products incorporating Zen 3 Cores, and all reasonably similar products (“the ’627 Accused Products”), in violation of 35 U.S.C. § 271(a).

32. Defendant currently is and has been an active inducer of infringement of the ’627 Patent under 35 U.S.C § 271(b) and contributory infringers under 35 U.S.C § 271(c).

33. Defendant has known about the ’627 Patent since at least the date of service of this Complaint. At least by the time of trial, AMD will or should have known and intended that its continued actions would infringe and actively induce and contribute to infringement of one or more claims of the ’627 Patent.

34. As a result of Defendant’s infringement, Nex-X has suffered and will continue to suffer damages in an amount to be determined at trial.

**COUNT II**

**(INFRINGEMENT OF U.S. PATENT NO. 8,856,587)**

35. The preceding paragraphs are incorporated by reference as if fully set forth herein.

36. The ’587 Patent recites 20 claims including independent claims 1, 12, and 16. *See* **Ex. 2**, 9:46-11:26.

37. Defendant has infringed and continues to infringe, literally or by the doctrine of equivalents, at least claim 1 of the ’587 Patent by making, using, testing, selling, offering for sale, or importing into the U.S. products and services covered by the ’587 Patent.

38. The claims of the ’587 Patent are directed to patent-eligible subject matter. In particular, the ’587 Patent is directed to, *inter alia*, a specific improvement in the computer operation of the caches of certain data processing devices. The claimed inventions comprise data processing devices having a cache with a plurality of cache lines, wherein the cache lines each have a lockout state that indicates whether an error has been detected for data accessed at the cache line. The data processing device further comprises a cache lockout policy scheme comprising at least two cache lockout policies, which collectively enables one of potentially many responses when an error has been detected for a cache line. The response can be based on criteria detectable by the system at runtime including the type of the data processing device.

39. The inventions claimed in the ’587 Patent provide a specific technical solution to a previously unsolved technical problem. Historically, data stored in or retrieved from a cache could enter an erroneous state due to hard errors (such as perpetually defective storage cells) or soft errors (such as transient alpha particle disruptions or marginal cell operation). While conventional devices incorporated error detection and correction modules to handle these errors, conventional error protection schemes were capable of only overly simplistic responses to the errors—either immediately invalidating the erroneous cache line and issuing an interrupt upon detecting an error or not doing anything at all. Deciding whether or not to generate an interrupt independently of invalidating the erroneous cache line is desirable however and can allow the former decision to be made based on a number of criteria besides an error in a cache line.

40. To address this issue, the inventors of the ’587 Patent developed a device and method incorporating a lockout scheme comprising at least two lockout policies, implemented using a cache control register. This technical solution allows programming to set if, in addition to a cache line invalidation, an interrupt (i.e., a machine-check interrupt) is generated when a detected error causes a cache line lockout. This provides a computer system more flexible control over how it implements cache memory error management, by for example, focusing on preventing error propagation under certain conditions while avoiding needless interrupts under other conditions.

41. The Defendant has directly infringed and continues to directly infringe at least claim 1 of the ’587 Patent, either literally and/or under the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States systems covered by one or more claims of the ’587 Patent. Defendant’s products and/or services that infringe the ’587 Patent include, but are not limited to, AMD’s EPYC 9005 Series products incorporating Zen 5 Cores, as well as any other AMD products, either alone or in combination, that operate in substantially the same manner (the “Accused ’587 Products”).

42. Claim 1 of the ’587 Patent is reproduced below:

> *1. In a data processing device comprising a processor unit coupled to a cache comprising a plurality of cache lines, a method comprising:*
>
> *in response to a first cache access to a first cache line of the plurality of cache lines:*
>
> *when a lockout policy for the cache is a first policy, generating an interrupt at the data processing device and setting a lockout indicator to a first state in response to detecting a first error in information stored at the first cache line; and*

*when the lockout policy for the cache is a second policy, responding to the first cache access without generating the interrupt, and setting the lockout indicator to the first state in response to detecting the first error; and*

*in response to a second cache access to the first cache line, preventing the first cache line from satisfying the second cache access when the lockout indicator is in the first state.*

**Ex. 2** at 9:46-64.

43. A claim chart showing an example of how Defendant infringes the ’587 Patent accompanies this Complaint as **Exhibit 6**.

44. Defendant directly infringed and continues to directly infringe one or more claims of the ’587 Patent, including at least claim 1 of the ’587 Patent, in the state of Texas, in this judicial district, and elsewhere in the United States by, among other things, making, using, selling, offering for sale, and/or importing into the United States products that embody one or more of the inventions claimed in the ’587 Patent, including but not limited to the above-identified AMD’s EPYC 9005 Series products incorporating Zen 5 Cores, and all reasonably similar products (“the ’587 Accused Products”), in violation of 35 U.S.C. § 271(a).

45. Defendant currently is and has been an active inducer of infringement of the ’587 Patent under 35 U.S.C § 271(b) and contributory infringers under 35 U.S.C § 271(c).

46. Defendant has known about the ’587 Patent since at least the date of service of this Complaint. At least by the time of trial, AMD will or should have known and intended that its continued actions would infringe and actively induce and contribute to infringement of one or more claims of the ’587 Patent.

47. As a result of Defendant's infringement, Nex-X has suffered and will continue to suffer damages in an amount to be determined at trial.

**COUNT III**

**(INFRINGEMENT OF U.S. PATENT NO. 8,966,232)**

48. The preceding paragraphs are incorporated by reference as if fully set forth herein.

49. The '232 Patent recites 20 claims including independent claims 1, 10, and 18. *See* **Ex. 3**, 21:55-28:25.

50. Defendant has infringed and continues to infringe, literally or by the doctrine of equivalents, at least claim 1 of the '232 Patent by making, using, testing, selling, offering for sale, or importing into the U.S. products and services covered by the '232 Patent.

51. The claims of the '232 Patent are directed to patent-eligible subject matter. In particular, the '232 Patent is directed to, *inter alia*, a specific improvement in the computer operation of multi-cache data processing systems operable in both single and multi-thread modes.

52. The inventions claimed in the '232 Patent provide a specific technical solution to a previously unsolved technical problem. In conventional data processing systems, simultaneous multi-threading (SMT) techniques improved processing efficiency by allocating different instances of like functional units (e.g., a load/store unit and its associated cache) to separate executing threads so as to increase instruction- and thread-level parallelism. However, when these same systems operated in single-thread mode, only the functional unit instances allocated to the single running thread could be used since functional units were statically assigned to that

thread whether the system was in a multi-threaded or single-threaded mode. This left functional units underutilized when the computer system was operating in a single-threaded mode.

53. To address this issue, the inventors of the ’232 Patent developed a data processing system in which a single thread, running on a system that is in single-thread mode, can utilize resources (e.g., data caches, store buffers, and load buffers) assigned to other running threads when the system is in multi-thread mode. In conventional systems, even when the system was in single thread mode, the sole running thread could only use the subset of the resources assigned to it when the system is in multi-thread mode. The data processing system of the ‘232 Patent allocates resources— multiple independent load/store units (LSUs) and dedicated store buffers, for example—to various threads when it is in multi-thread mode, but all to the single running thread when it is in single-thread mode.

54. The Defendant has directly infringed and continues to directly infringe at least claim 1 of the ’232 Patent, either literally and/or under the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States systems covered by one or more claims of the ’232 Patent. Defendant’s products and/or services that infringe the ’232 Patent include, but are not limited to, AMD’s EPYC 9004 Series products incorporating Zen 4 Cores, as well as any other AMD products, either alone or in combination, that operate in substantially the same manner (the “Accused ’232 Products”).

55. Claim 1 of the ’232 Patent is reproduced below:

*1. A data processing system comprising:*

*a processing unit including:*

*a first LSU (load/store unit);*

*a second LSU configured to operate independently of the first LSU in single and multi-thread modes;*

*a first store buffer coupled to the first and second LSUs; and*

*a second store buffer coupled to the first and second LSUs, wherein*

*the first store buffer is used to execute a first thread in multi-thread mode,*

*the second store buffer is used to execute a second thread in multi-thread mode, and*

*the first and second store buffers are used when executing a single thread in single thread mode.*

**Ex. 3** at 21:55-22:2.

56. A claim chart showing an example of how Defendant infringes the '232 Patent accompanies this Complaint as **Exhibit 7**.

57. Defendant directly infringed and continues to directly infringe one or more claims of the '232 Patent, including at least claim 1 of the '232 Patent, in the state of Texas, in this judicial district, and elsewhere in the United States by, among other things, making, using, selling, offering for sale, and/or importing into the United States products that embody one or more of the inventions claimed in the '232 Patent, including but not limited to the above-identified AMD's EPYC 9005 Series products incorporating Zen 5 Cores, and all reasonably similar products ("the '232 Accused Products"), in violation of 35 U.S.C. § 271(a).

58. Defendant currently is and has been an active inducer of infringement of the '232 Patent under 35 U.S.C § 271(b) and contributory infringers under 35 U.S.C § 271(c).

59. Defendant has known about the ’232 Patent since at least the date of service of this Complaint. At least by the time of trial, AMD will or should have known and intended that its continued actions would infringe and actively induce and contribute to infringement of one or more claims of the ’232 Patent.

60. As a result of Defendant’s infringement, Nex-X has suffered and will continue to suffer damages in an amount to be determined at trial.

**COUNT IV**

**(INFRINGEMENT OF U.S. PATENT NO. 9,229,884)**

61. The preceding paragraphs are incorporated by reference as if fully set forth herein.

62. The ’884 Patent recites 18 claims including independent claims 1, 12, and 18. *See* **Ex. 4**, 14:60-16:47.

63. Defendant has infringed and continues to infringe, literally or by the doctrine of equivalents, at least claim 18 of the ’884 Patent by making, using, testing, selling, offering for sale, or importing into the U.S. products and services covered by the ’884 Patent.

64. The ’884 Patent relates to a partitioned data processing system in which (i) resources are divided into logical partitions that each operate as a separate virtual computer, (ii) a program running in one partition (e.g., a guest operating system controlling that separate virtual computer) cannot access the resources allocated to another partition (i.e., resources controlled by another program), and (iii) certain shared resources can be accessed by any of the programs running on any of the partitions, leaving control over such shared resources to trusted higher-level software (e.g., a hypervisor operating system that creates and manages the system’s guest

operating systems). A partitioned interrupt controller is an example of a shared resource that can be used by any of the virtual computers that control any of the partitions.

65. The ’884 Patent is directed to, *inter alia*, a specific improvement in the computer operation of such partitioned data processing systems. The inventions claimed in the ’884 Patent provide a specific technical solution to a previously unsolved technical problem. Some conventional partitioned systems replicated each logical partition’s required hardware resources—even resources that are often shared—on a per virtual computer (i.e., on a per processor core) basis. However, this approach does not scale beyond a small number of processor cores due to excessive hardware requirements for die area, wiring, and memory management as normally shared resources are replicated in each partition. Other conventional partitioned systems evaluated, on a per resource-access transaction basis, which partition could respond to a shared-resource access request. But this was typically achieved using complex external sideband signaling that consumed significant hardware and processing overhead and presented challenges with transaction ordering since a first shared resource access transaction could take much longer to process over a sideband signaling system than a subsequent shared-resource access transaction. The ‘884 patent addresses these issues for a partitioned interrupt controller, by directing itself to an improved partition-aware and secure access operation for such an interrupt controller. Specifically, the ’884 Patent discloses a partitioned interrupt controller that replies to an interrupt request—a shared resource access request—by executing a specialized interrupt control instruction (e.g., it is a part of the processors’ instruction set architecture (ISA)) that: (1) encodes the partition associated with the interrupt request in the instruction’s data payload and (2) performs a memory-mapped secure store operation that ultimately results in the encoded data payload being sent to a special-purpose register whose contents control how the

interrupt control instruction operates and which can only be modified by trusted software. Because a partition is associated with the interrupt request instruction itself, the system can enforce partition-aware access by processing this partition-aware specialized hardware instruction without performing complex multi-step software sequences. Because interrupt control instructions are sent to the same special-purpose register, sequencing of operations can be maintained at the register. Because the shared resource access request is ultimately sent to a register controlled only by a trusted program, less trusted programs cannot modify that register which means they also cannot control the partitioned interrupt controller. The ‘884 Patent’s system also eliminates the scaling overhead and transaction ordering issues associated with duplicating all resources including typically shared resources in each partition.

66. The ‘884 Patent performs memory-mapped secure store operations directly to certain registers such as an interrupt controller command register.

67. The Defendant has directly infringed and continues to directly infringe at least claim 18 of the ’884 Patent, either literally and/or under the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States systems covered by one or more claims of the ’884 Patent. Defendant’s products and/or services that infringe the ’884 Patent include, but are not limited to, AMD’s EPYC 9004 Series products incorporating Zen 4 Cores, as well as any other AMD products, either alone or in combination, that operate in substantially the same manner (the “Accused ’884 Products”).

68. Claim 18 of the ’884 Patent is reproduced below:

*18. A data processing system comprising:*

*a partitioned interrupt controller; and*

> *a processor coupled to the partitioned interrupt controller, wherein the processor executes an interrupt control instruction to encode a data payload with a command and a logical partition identifier (LPID) associated with a first interrupt request, and to perform a secure store operation of the data payload to a storage address at the partitioned resource using a memory-mapped secure store operation, where the storage address is retrieved from a dedicated address register at the processor.*

**Ex. 4** at 14:60-15:7.

69. A claim chart showing an example of how Defendant infringes the ’884 Patent accompanies this Complaint as **Exhibit 8**.

70. Defendant directly infringed and continues to directly infringe one or more claims of the ’884 Patent, including at least claim 18 of the ’884 Patent, in the state of Texas, in this judicial district, and elsewhere in the United States by, among other things, making, using, selling, offering for sale, and/or importing into the United States products that embody one or more of the inventions claimed in the ’884 Patent, including but not limited to the above-identified AMD’s EPYC 9004 Series products incorporating Zen 4 Cores, and all reasonably similar products (“the ’884 Accused Products”), in violation of 35 U.S.C. § 271(a).

71. Defendant currently is and has been an active inducer of infringement of the ’884 Patent under 35 U.S.C § 271(b) and contributory infringers under 35 U.S.C § 271(c).

72. Defendant has known about the ’884 Patent since at least the date of service of this Complaint. At least by the time of trial, AMD will or should have known and intended that its continued actions would infringe and actively induce and contribute to infringement of one or more claims of the ’844 Patent.

73. As a result of Defendant's infringement, Nex-X has suffered and will continue to suffer damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs ask the Court to enter judgment as follows:

A. Declare that AMD has infringed and continues to infringe each of the asserted patents identified in Counts I-IV;

B. Award Nex-X damages adequate to compensate it for Defendant's infringement, in an amount to be proven at trial, but in no event less than a reasonable royalty, together with pre-judgment and post-judgment interest as allowed by law;

C. Award Nex-X its costs, disbursements, and fees under 35 U.S.C. § 285;

D. Permanently enjoin Defendant, its officers, agents, affiliates, employees, attorneys, and all others acting in concert or along with Defendant from infringing the asserted patents; and

E. Award any other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Nex-X demands a trial by jury for all triable claims under Fed. R. Civ. P. 38.

Respectfully submitted,

Dated: October 7, 2026

By: */s/ Karl Rupp*

Karl Rupp
State Bar No. 24035243
SOREY & HOOVER, LLP
133 E. Tyler Street
Longview, Texas 75601
Tel: (903) 230-5600
Fax: (903) 230-5656
krupp@soreylaw.com

Matthew D. Vella
mvella@princelobel.com
Jessica L. Perry
jperry@princelobel.com
Steven Daniels
sdaniels@princelobel.com
Brian Seeve
bseeve@princelobel.com
Aaron Jacobs
ajacobs@princelobel.com
Amanda L'Esperance
alesperance@princelobel.com
**Prince Lobel Tye LLP**
One International Place, Suite 3700
Boston, Massachusetts 02110
Telephone: +1 (617) 456-8000

*Counsel for Plaintiff Nex-X Silicon LLC*